# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 8, 2004      Decided February 18, 2005

No. 03-1222

CENTER FOR ENERGY AND ECONOMIC DEVELOPMENT,
PETITIONER

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

PHELPS DODGE CORPORATION, ET AL.,
INTERVENORS

———

On Petition for Review of an Order of the
Environmental Protection Agency

———

*Paul M. Seby* argued the cause for petitioner. With him on the briefs was *Peter S. Glaser*. *Adam T. DeVoe* and *Sean M. Sullivan* entered appearances.

*Kenneth C. Amaditz,* Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief were *John C. Cruden*, Deputy Assistant Attorney General, and *Jan M. Tierney*, Attorney, U.S. Environmental Protection Agency.

*Joseph P. Mikitish*, Assistant Attorney General, Attorney General's Office of State of Arizona, argued the cause for

*amici curiae* State of Arizona, et al. in support of respondent. With him on the brief were *Terry Goddard*, Attorney General, *Bill Lockyer*, Attorney General, Attorney General's Office of State of California, *Manel M. Medeiros*, Solicitor General, *Lisa Madigan*, Attorney General, Attorney General's Office of State of Illinois, *Gary Feinerman*, Solicitor General, *Patricia Madrid*, Attorney General, Attorney General, Attorney General's Office of State of New Mexico, *Tracy M. Hughes*, Special Assistant Attorney General, *Mark Shurtleff*, Attorney General, Attorney General's Office of State of Utah, *Fred Nelson*, Assistant Attorney General, *Patrick J. Crank*, Attorney General, Attorney General's Office of State of Wyoming, and *Jay Jerde*, Senior Assistant Attorney General. *Charles F. Noble*, Attorney, New Mexico Environment Department, entered an appearance.

*Chris S. Leason*, *Vickie L. Patton*, and *Thomas A. Bloomfield* were on the brief for intervenors Phelps Dodge Corporation, et al.

Before: EDWARDS and HENDERSON, *Circuit Judges,* and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: Haze obscuring the Grand Canyon and various other national parks and wilderness areas in the west is a multi-state problem. In the interests of developing a solution, the Environmental Protection Agency in 1999 adopted a Regional Haze Rule ("Haze Rule"), 40 C.F.R. §§ 308-309. Section 308 required states to impose best available retrofit technology ("BART") on so-called "BART-eligible sources," a specified class of large stationary pollution sources that had been in operation since August 7, 1977. In *American Corn Growers Ass'n v.*

*EPA*, 291 F.3d 1 (D.C. Cir. 2002), we vacated parts of § 308 because we found EPA's methods for determining BART inconsistent with the Clean Air Act. Those aspects of the Haze Rule remain pending before EPA on remand.

Section 309 of the Haze Rule, however, permitted states to reduce haze by alternative means, including a regional approach, so long as the alternative would be "better than BART"—i.e., improve visibility more rapidly than under BART. In the rule before us, which implements the Haze Rule, EPA approved a regional alternative. To determine whether the rule was better than BART, EPA used a BART methodology quite similar to the one *American Corn Growers* condemned. On a challenge by the Center for Energy and Economic Development, representing a group of pollution sources in the region, we find that the similarity fatally taints EPA's rule.

\* \* \*

The disputed regulations in this case arise from two amendments to the Clean Air Act. Section 169A, adopted in 1977, "declare[d] as a national goal the prevention of any future, and the remedying of any existing, impairment of visibility in mandatory class I Federal areas which impairment results from manmade air pollution." 42 U.S.C. § 7491(a)(1). It instructed EPA to require covered states to submit state implementation plans ("SIPs") that "contain such . . . measures as may be necessary to make reasonable progress toward meeting the national goal." 42 U.S.C. § 7491(b)(2). In determining reasonable progress, EPA was to consider four factors—"the costs of compliance, the time necessary for compliance, . . . the energy and nonair quality environmental impacts of compliance, and the remaining useful life of any existing [regulated] source." 42 U.S.C. § 7491(g)(1). In imposing BART requirements on the states, EPA was to

consider those four factors, plus "the degree of improvement in visibility which may reasonably be anticipated to result from the use of such technology." 42 U.S.C. § 7491(g)(2).

On July 1, 1999 EPA promulgated the Haze Rule—essentially 40 C.F.R §§ 51.308-309. Section 308 sets out requirements for SIPs to achieve natural visibility conditions by 2064. 40 C.F.R. § 51.308(d). In *American Corn Growers* we addressed § 308(e)(1), which had instructed states to measure the first four BART factors by source, but to measure the degree of anticipated visibility improvement by area affected—in effect, by groups of sources defined by area of impact. 40 C.F.R. §§ 51.308(e)(1)(ii)(A)-(B). "To treat one of the five statutory factors in such a dramatically different fashion distorts the judgment Congress directed the states to make for each BART-eligible source." *American Corn Growers*, 291 F.3d at 6. As a result, we found, a state could be compelled to impose BART on a source even if the imposition would have "no appreciable effect on the haze in any class I area." *Id*. at 7. We reversed and remanded, and the remand is now pending before EPA.

Section 169B, adopted in 1990, expressed a broadened congressional concern, instructing EPA to research visibility impairment in national parks and wilderness ("Class I") areas. 42 U.S.C. § 7492(a)(1). It also directed EPA to "establish a visibility transport commission for the region affecting the visibility of the Grand Canyon National Park." 42 U.S.C. § 7492(f). One year later, EPA created the Grand Canyon Visibility Transport Commission (the "Commission") to conduct research and recommend remedial measures. The Commission submitted recommendations to EPA in a 1996 report, covering the Grand Canyon and fifteen other Class I areas on the Colorado Plateau.

EPA pursued the implications of § 169B by incorporating in the Haze Rule not only a BART mandate but a regional alternative. It allowed states "to implement an emissions trading program or other alternative measure" so long as the alternative would achieve "better than BART" results. 40 C.F.R. §§ 51.308(e)(2), 51.309(a). Under § 309, the Commission, or a regional body formed to implement a prior Commission report, may opt for a regional alternative by submitting an "annex" to that report. If EPA approved the program described in the annex, then any state among the nine covered by the Commission could adopt the program in lieu of the state-by-state requirements. See 40 C.F.R. § 51.309(f). EPA approval would turn largely on whether the regional alternative provides "greater reasonable progress [toward natural visibility levels] than would be achieved by [BART]." 40 C.F.R. § 309(f)(1)(i).

The Western Regional Air Partnership ("WRAP"), a regional body formed to implement the 1996 Commission report, submitted an annex in September 2000. The resulting plan has a number of important similarities to and differences from the program before us in *American Corn Growers*. First, to develop "milestones" that would meet the Haze Rule's better-than-BART standard, WRAP estimated BART's likely achievements with a methodology similar to what we rejected in *American Corn Growers*. It applied the four factors other than visibility improvement by source category rather than individually, but, just as had the approach rejected in *American Corn Growers*, it measured visibility improvement in terms of the cumulative effect on particular Class I areas of changes in emissions from *all* covered sources in the "transport region." See Annex, Attachment C at C-4, C-11-12. Ultimately, "the milestones were negotiated numbers," see Annex Rule, 68 Fed. Reg. 33,764, 33,769/1 (June 5, 2003), but these estimations were evidently a core basis for the negotiations.

Second, the Annex doesn't directly impose restrictions on any sources. Rather, it sets various emission limitation "milestones" that steadily decline over time. If sources in the aggregate fail to meet these milestones "voluntarily," a backstop emissions trading program will come into force. Under it, sources may not emit the relevant pollutants in amounts exceeding their entitlements—which they will have received either via allotment from the state or via trading. It was plausible that the trading program would meet the better-than-BART benchmark because it covers many sources besides ones that are BART-eligible under the statutes and § 308. And the provision for trading presumably would reduce the cost for any given level of emissions reduction. See generally *Acid Rain Program: General Provisions and Permits, Allowance System, Continuous Emissions Monitoring, Excess Emissions and Administrative Appeals*, 58 Fed. Reg. 3590 (Jan. 11, 1993).

EPA approved and promulgated the substantially similar Annex Rule. 68 Fed. Reg. 33,764 (June 5, 2003).

The Center for Energy and Economic Development, representing a group of pollution sources in the region, petitions for review. It argues that the EPA's BART benchmark is unlawful under our analysis in *American Corn Growers*. After addressing various preliminary issues, we grant the petition.

\* \* \*

EPA raises two jurisdictional objections to the petition—that the petitioner lacks standing and that our judgment in *American Corn Growers* precludes review. We reject both.

Standing of course comprises the familiar elements of injury in fact, causation, and redressability, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). EPA has posed several objections to standing, some in its original brief and another in a round of briefing that we requested after oral argument. Initially EPA said that the Annex Rule's "voluntary" system of trading emission allowances was more favorable to the Center than are the "command and control" § 308 BART rules that would otherwise apply on remand from *American Corn Growers*. Moreover, if the Center is correct that the Annex Rule does not achieve enough visibility improvement to constitute "reasonable progress," EPA reasoned that a rule meeting that standard would necessarily be more stringent and thus would only worsen the Center's burden.

Both arguments fail. The Center rightly points out that the Annex Rule requires immediate compliance with certain reporting requirements, subject to sanctions, so the rule burdens the Center's members *now*, which normally is enough for standing. See *Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002). As to the difference between § 308 and the Annex Rule, EPA's argument that the Annex Rule is necessarily more lenient errs on two counts. First, as between a § 308 that has not yet been repromulgated, see 69 Fed. Reg. 25,184 (May 5, 2004), and a living Annex Rule, the injury from the latter seems clear. Second, contrary to EPA's characterization, the Center's complaint about the method of calculating reasonable progress is not that the Annex Rule is too lenient, but that, in violation of *American Corn Growers*, it lacks legally required evidence of attendant visibility gains. The Center's hope that both § 308 and the Annex Rule will emerge from remand imposing substantially lighter burdens on its members is hardly chimerical. "Where an agency rule causes the injury," as here, "the redressability requirement may be satisfied . . . by vacating the challenged rule and

giving the aggrieved party the opportunity to participate in a new rulemaking the results of which might be more favorable to it." *America's Community Bankers v. FDIC*, 200 F.3d 822, 828-29 (D.C. Cir. 2000).

Following oral argument, we invited the parties to brief the issue whether any harm to the Center's members from the Annex could properly be said to stem from *EPA*'s action. After all, EPA's rules offered the Annex as an optional alternative to § 308, and for the moment § 308 languishes in unpromulgated limbo. State pursuit of the Annex alternative is the direct cause of injury to the Center's members, and all the states could, for a time, have refrained from any action. EPA responded that as between §§ 308 and 309, "[t]he choice is left entirely to the States," four of which did not choose § 309. Intervenors and seven amici states in support of EPA also remind us that the western states themselves initially provided the "blueprint" or "roadmap" for the Annex Rule. See Amicus Supp. Br. at 4, Intervenors Supp. Br. at 6. "A decision to strike the Annex Rule," the amici states observe, "would not prevent Western States from adopting the same limitations in order to achieve reasonable progress." Amicus Supp. Br. at 13; see also Resp. Supp. Br. at 11-12.

The existence of state choice is in itself immaterial. "'Your money or your life?' calls for a choice, but each option makes the recipient of the offer worse off." *Henn v. Nat'l Geographic Soc'y*, 819 F.2d 824, 826 (7th Cir. 1987). Under § 309(f)(1) of the Haze Rule a state can, by filing a valid annex with the Commission or appropriate regional body, "satisfy the requirements of § 51.308(b) through (e)," i.e., fulfill its otherwise applicable Haze Rule obligations and avoid the trouble of expending its own administrative resources to develop other measures while BART remains pending before EPA. The states' choice, in other words, is between one burden and another.

Nor does the states' initiative in designing the Annex undermine the inference that EPA's pressure has been decisive, much less prove that the states acted spontaneously. The Annex Rule addresses *regional* haze—"air pollutants emitted by numerous sources across a broad region" that impair "visibility in the 16 Class I areas on the Colorado Plateau." 68 Fed. Reg. at 33,765. Regional haze is a problem in which the benefits of each state's emissions controls are largely felt in other states. Without federal intervention, then, a state calculating how hard it should press in limiting pollution has no incentive to consider resulting enhancements of other states' welfare. There is no reason to believe that New Mexico, for example, would without federal pressure tighten limits for in-state polluters an extra notch so that tourists could gaze at clear skies above the Grand Canyon. Even an anti-pollution commitment demonstrated by "numerous stakeholder meetings and public workshops across the West," Intervenors Supp. Br. at 3, does not explain why one state would, absent federal pressure, martyr itself for another, or subject its electric power users (for example) to additional costs for the benefit of out-of-state interests. Cf. *Maryland People's Counsel v. FERC*, 761 F.2d 768, 778 (D.C. Cir. 1985) ("[I]t is ridiculous to assume that" a company would "engage in . . . self-sacrificing behavior" "simply because there is nothing that stops it from doing so"). The western states, though active, were not self-starting: "The Commission *was given the charge* to . . . address[] regional haze." WRAP Report, at I.B. (emphasis added).

As a result, the regulatory scheme "is at least a substantial factor motivating the [states'] actions," and the Center alleges an injury to its members that is "fairly traceable" to that scheme. *Tozzi v. U.S. Dep't of Health and Human Servs.*, 271 F.3d 301, 308 (D.C. Cir. 2001) (quoting *Cmty. for Creative Non-Violence v. Pierce*, 814 F.2d 663, 669 (D.C. Cir. 1987)).

Moreover, as the western states are well aware, § 308's days as an unpromulgated rule are numbered. Nothing in *American Corn Growers* suggests the contrary. Given zero prospect of avoiding federal regional haze regulation altogether, the states have reason to get ahead of the game by devising their own plans, and securing EPA approval, now. Under the Haze Rule, states adopting a § 309 alternative must submit their SIPs by December 31, 2003, five years before states operating under § 308 must submit theirs. 40 C.F.R. §§ 51.309(c), 51.308(b). The amici states suggest that § 309's requirement of swifter action makes it less appealing, showing—they suppose—that § 308 cannot have played a causal role. But the distinction cuts the other way if the states have reason to believe complying with § 309 will be more appealing, as it may well, at least in part because the emissions trading program is likely to enable sources to achieve the desired cutbacks at lower total cost. Thus, even a state believing that the BART rule emerging from remand will be materially milder than its predecessor could reasonably prefer the Annex approach and would have a regulatory incentive to jump now, for fear of losing the Annex option. Cf. *Block v. Meese*, 793 F.2d 1303, 1308 (D.C. Cir. 1986) (finding standing on a showing that agency action "create[d] a disincentive" from which plaintiffs suffered). So understood, the earlier § 309 deadline spurs states promptly to implement § 309 rather than wait for § 308 to reemerge from remand.

EPA's second jurisdictional challenge is that the Center's claims were ripe but defeated in *American Corn Growers*, and are now precluded. In particular, EPA objects to the Center's arguments regarding EPA's statutory authority to promulgate the Annex Rule, the Annex Rule's effect on state discretion, and the Annex Rule's compliance with § 309 reasonable progress goals. These purely legal arguments, EPA contends, were ripe for review when it promulgated the Haze Rule, as that rule, especially §§ 308(e)(2) and 309(f), set out the

criteria for approving an Annex—criteria the Annex Rule faithfully applied. EPA reads *American Corn Growers* as having struck down only the group BART provisions governing BART imposition, not those governing BART alternatives. As the Center neither sought clarification nor petitioned for rehearing, EPA regards this petition as a "back-door challenge" to the Haze Rule, Resp. Br. at 22, filed well past the Clean Air Act's sixty-day, post-publication window. See 42 U.S.C. § 7607(b)(1).

The Center, by contrast, reads *American Corn Growers* as concluding "that the Haze Rule's BART provisions are contrary to . . . § 169A." 291 F.3d at 8-9. By the Center's reading, we have already held §§ 308(e)(2) and 309(f) to be invalid "BART provisions" because *American Corn Growers* did not distinguish mandatory BART from BART alternatives. Reply Br. at 10-11. Alternatively, the Center argues that *American Corn Growers* implicitly regarded issues revolving around §§ 308(e)(2) and 309(f) as unripe and therefore to be dealt with in "a more choate situation in the future." Reply Br. at 12-13.

The exact parsing of *American Corn Growers* has in the end no effect. While we limited the decision carefully, "hold[ing] only that the Haze Rule's treatment of § 169A(g)(2)'s benefit calculation and its infringement on states' authority . . . render the BART provisions of the rule impermissible," 291 F.3d at 9, we gave no intimation that a better-than-BART standard, defined simply as achieving more rapid progress than BART, could ever pass muster. On the other hand, we never explicitly addressed better-than-BART in the § 309 context, a hesitation reasonably based on the possibility that the BART benchmark used to calculate "better-than-BART" might in the end differ materially from the original BART. See *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 812 (2003) (facial challenge to a

federal regulation is unripe if it "rel[ies] on specific characteristics of certain types of [disputed] contracts to support [its] positions"). As in fact it did: recall that whereas the BART calculation struck down in *American Corn Growers* applied the first four factors by source, the progress imputed from BART to support the Annex "milestones" was estimated on the basis of clusters of sources by source type. Either way *American Corn Growers* is read, it plainly forbade use of the original BART methodology in any § 169A context. We thus turn to the merits.

* * *

The Center's first argument on the merits is that § 169A flatly bars the Annex Rule's approach insofar as it deviates from BART (correctly conceived). Under section 169A(b)(2), EPA's regulations must require SIPs

> to contain such emission limits, schedules of compliance and other measures as may be necessary to make reasonable progress toward meeting the national [visibility] goal . . . , including—
>
> > (A) . . . a requirement that each [BART-eligible source] . . . shall [implement BART] as determined by the State . . . .

42 U.S.C. § 7491(b)(2). We review EPA's interpretation of this provision under the standard framework of *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Provided the statute is ambiguous, we defer to the agency's interpretation as long as it is reasonable.

The Center asserts that § 169A(b)(2) can be read only one way. That is, each SIP's constituent measures must "includ[e]" BART. That the Annex Rule—unlike

§ 169A—also applies to BART-*in*eligible sources is no answer, the Center insists, at least to the extent EPA applies the Annex Rule to BART-eligible ones. The Center also cites excerpts from the Clean Air Act's legislative history to suggest Congress did not intend to give EPA a choice on whether to include BART.

EPA, by contrast, sees "at least two permissible interpretations" of § 169A(b)(2). Resp. Br. at 30. One is the Center's. The other is that each SIP's "emission limits, schedules of compliance and other measures" must "include[e]" BART only "as may be necessary to make reasonable progress toward" national visibility goals. *Id*. (quoting 42 U.S.C. § 7491(b)(2)). If WRAP's alternatives would achieve greater progress than BART, then BART would not be "necessary to make reasonable progress." The Ninth Circuit, EPA observes, upheld this reading in *Central Arizona Water Conservation District v. EPA*, 990 F.2d 1531, 1543 (9th Cir. 1993).

The Center never explains why EPA *must* detach the "inclu[sion]" of BART from the condition that it be "necessary to make reasonable progress" to national visibility goals. Nor can we discern a reason. Moreover, the Center's legislative history references all pertain to § 169A. Congress's addition of § 169B, however, clarified that the focus of the Clean Air Act was to achieve "actual progress and improvement in visibility," 42 U.S.C. § 7492(b), not to anoint BART the mandatory vehicle of choice. It is no wonder, then, that § 169B(d)'s list of issues on which any visibility transport commission is to make assessments and reports, see 42 U.S.C. § 7492(d), includes no reference to BART at all. Thus the Center has shown neither that Congress's language precluded non-BART alternatives where BART wasn't "necessary to make reasonable progress," nor that EPA's reading is otherwise unreasonable.

EPA nevertheless must rationally exercise its § 169A discretion to approve better-than-BART SIPs. See 42 U.S.C. § 7607(d)(9)(A). The Center argues that EPA did not, because *American Corn Growers* invalidated "the key premise on which EPA developed the Annex Rule—that 'better than BART' means 'better than group-BART,'" Pet. Br. at 37. The latter is the Center's label for the hybrid BART condemned in *American Corn Growers*: evaluating prospects of visibility improvement by reference to all sources affecting an area, but evaluating the other BART factors by reference to individual plants or similar types of plants. Given that WRAP developed the Annex using a variant of pre-remand BART, the Center considers the ensuing emission limitations irrational. In other words, EPA cannot under § 309 require states to exceed invalid emission reductions (or, to put it more exactly, limit them to a § 309 alternative defined by an unlawful methodology).

By EPA's contrary reading, *American Corn Growers* only invalidated group (or hybrid) BART "when *imposing* BART on specific sources." Resp. Br. at 35. Whether this distinction was relevant for purposes of ripeness, EPA provides no reason why it signifies the substantive difference EPA presses here. Once installed, the Annex Rule is not merely advisory—covered states *impose* its requirements on the Center's members. The less stringent § 308 BART is, the less stringent need be the state requirements under § 309.

EPA makes no effort to distinguish the original BART calculations from those employed in choosing the Annex Rule's "milestones." This omission was a sensible saving of paper. Though the Annex Rule clustered sources by source type in hypothesizing emissions reductions, it looked to the impact of *all* emissions reductions to estimate visibility progress, and thus remained a hybrid.

15

Consequently, we do not reach the Center's additional objections to the Annex Rule's impact on state authority and implementation of § 169A reasonable progress goals. The petition for review is

*Granted*.